## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| MARK C. DAUGHERTY, | |
| Plaintiff, | |
| v. | |
| NICOLE MCCLUSKY, n/k/a Nicole Bonnell, WEXFORD HEALTH SOURCES, INC., DR. DAVID LUDFORD, DR. ARTHUR FUNK, PERSONAL REPRESENTATIVE FOR THE ESTATE OF DR. SALEH OBAISI, CYNTHIA WHITMER, CHRISTINE AGUAYO, TONYA WOHLFORD, AMELIA KING, HEATHER LANCE, BRADLEY WAGNER, SUE CALHOUN, MICKEY ABENS, KRISTA TORRES, DAMILOLA OREMAKINDE, JOHN VARGA, AND DAVID GOMEZ, | Case No. 3:18-cv-50088  Honorable Iain D. Johnston |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

As an inmate in Illinois state prison, Plaintiff Mark Daugherty relied on the medical services provided by the state—with no ability to procure his own independent care. A little over a year after his incarceration at Dixon Correctional Center, Daugherty experienced blurry vision in his right eye. On July 20, 2016, he reported to sick call and was referred to an eye doctor. Dkt. 198, ¶¶ 22–28. After waiting months to see that eye doctor, his vision had seriously declined—first with central vision loss and eventually to total blindness in that eye. *Id.* ¶ 50. This litigation ensued.

1

After successful motions to dismiss and multiple amended complaints, Defendants have filed ten motions to dismiss Daugherty's third-amended complaint. For the reasons below, the various motions to dismiss the individual defendants [200, 202, 204, 206, 207, 209, 211, 215, 219] are granted. The motion to dismiss Wexford Health Sources [213] is granted in part and denied in part.

## I. Background

On April 8, 2015, Mark Daugherty was incarcerated at Dixon Correctional Center.[1] On August 2, 2017, he was transferred to Sheridan Correctional Center. Both are Illinois Department of Corrections facilities. Dkt. 198, ¶ 4. He was released on June 22, 2018. *Id.* Daugherty's allegations center around his time at both facilities and the vision issues he began to experience while an inmate at Dixon Correctional Center. For clarity, the Court begins with a recitation of the various defendants.

Defendant Dr. David Ludford was a physician and licensed optometrist at Dixon Correctional.[2] *Id.* ¶ 5. Dr. Arthur Funk was the Regional Medical Director for Wexford Health Sources. *Id.* ¶ 6. Dr. Saleh Obaisi, now deceased, was a physician at Sheridan Correctional. *Id.* ¶ 7. Defendants Cynthia Whitmer, Christine Aguayo, Tonya Wohlford, Amelia King, and Heather Lance are nurses with the Illinois Department of Corrections.[3] *Id.* ¶¶ 8–9, 11-1. Defendant Bradley Wagner was also a

---

[1] The factual allegations are taken from Daugherty's third-amended complaint. Dkt. 198.
[2] The Court uses the past tense only to show the status of the defendants at the past relevant times. The Court is unaware of each defendant's current status.
[3] The third-amended complaint alleges that some of these defendant nurses worked for Wexford Health Sources but omits that allegation as to the others.

nurse, and appears to have worked at Dixon, though the complaint is not explicit on that fact. *Id.* ¶ 14. Nicole McClusky, now known as Nicole Bonnell, is alleged to have been an employee of Wexford Health Sources, but she is not alleged to be a medical professional. *Id.* ¶ 10. Defendants Mickey Abens, Krista Torres, and Damilola Oremakinde were nurses with the Illinois Department of Corrections at Sheridan Correctional Center. *Id.* ¶¶ 16–18. Sue Calhoun was a clinical nurse at Sheridan. *Id.* ¶ 15. Defendants John Varga and David Gomez were the acting wardens of Dixon Correctional and Sheridan Correctional, respectively. *Id.* ¶¶ 19–20. Daugherty also sues Wexford Health Sources, which holds a contract with the Illinois Department of Corrections to provide medical care to inmates. *Id.* ¶ 21.

On July 20, 2016, Daugherty went to sick call and told Nurse Whitmer that his right eye was blurry. *Id.* ¶ 23. He was then referred to an eye doctor. *Id.* But at that time, no eye doctor was on staff to provide optometry care to inmates. *Id.* ¶ 24. Thus, to be seen right away, Daugherty would have had to be referred to an outside provider. *Id.* Daugherty alleges that his eye was fine when he arrived at Dixon and also at a subsequent exam on December 23, 2015. *Id.* ¶ 22. He then seems to allege that the complaint of blurry vision seven months later amounts to a sudden and unexplained change in his vision *Id.* ¶ 25. Although that leap of logic may not be supportable, it is also not necessary. Regardless of how sudden the problem was, the complaint alleges that Daugherty presented with unexplained blurry vision and that medical staff knew he needed to be seen by an eye doctor, who was not on staff at that time.

3

Instead of being sent to an eye doctor immediately, the nursing staff placed Daugherty on a waiting list. *Id.* ¶ 28. On August 8, 2016, Daugherty returned to sick call, again seeking a visit with an eye doctor. *Id.* ¶ 29. Nicole Bonnell (formerly known as Nicole McCluskey) again placed him on the waiting list to see an eye doctor. In the meantime, Daugherty's vision continued to decline. *Id.* On September 14, 2016, Daugherty again returned to sick call at least in part because his vision further declined. *Id.* ¶ 32. At that time, Nurse Aguayo again informed him that he was on the waitlist. *Id.* He alleges that the nursing staff knew he needed to see an eye doctor, that they did not have one on staff, and that he would have had to see an outside provider to receive the necessary timely treatment. *Id.* ¶ 31 Still, he was not offered any alternative options to receive treatment from an eye doctor, even though one was not otherwise available. *Id.* ¶ 35. To be sure, he had access to nursing staff, but he allegedly had no access to an eye doctor other than being placed on a lengthy waitlist.

Instead, Nurse Aguayo and Nicole Bonnell informed him that he would be disciplined if he returned again—they said they would "write him a ticket." *Id.* Almost a week later, on September 20, 2016, Bonnell wrote Daugherty a memorandum that acknowledged his request for an eye examination and noted that he was placed on a waiting list and that no eye doctor was currently on staff. *Id.* ¶ 37. Daugherty filed his first grievance more than four months later, having yet to be seen by an eye doctor. *Id.* ¶ 39. In a bit of perverse logic, the grievance was deemed moot because he had been placed on the waitlist. *Id.* Obviously, being placed on the

4

waitlist does not address the medical condition. The whole purpose of a grievance is to resolve problems, not to ignore them.

Notwithstanding the threat of a "ticket," Daugherty returned to sick call again on March 9, 2017, and saw Nurses Wohlford and King. He explained that his vision continued to decline and that he still had not been seen by an eye doctor even though nine months had passed since he was referred to one and placed on the waitlist. *Id.* ¶ 43. But as Daugherty notes, the nurses were not empowered to do anything about his condition: "The nursing staff are not trained eye doctors, nor could they prescribe medication or even order a referral to an outside facility." *Id.* ¶ 44.

Four days later, on March 13, 2017, Bonnell provided Daugherty with another memorandum acknowledging his request to be seen by an eye doctor and noting that he was on the waitlist. *Id.* ¶ 47. Dr. Ludford, who had been hired in February 2017, *id.* ¶ 27, examined Daugherty on April 6, 2017, more than eight months after the initial July 20, 2016, complaint of blurry vision, *id.* ¶ 48. He recommended that Daugherty be seen immediately by an outside specialist. *Id.* That specialist, Dr. Hanlon, examined Daugherty on May 8, 2017, and recommended Daugherty be immediately referred to the University of Illinois at Chicago (UIC). *Id.* ¶ 52.

Daugherty's appointment with UIC was supposed to take place around May 24, 2017. That did not happen. Though the complaint is void of any factual allegations about why, Daugherty alleges in a conclusory fashion that the missed

appointment was "due to the Defendants' continued deliberate indifference." *Id.* ¶ 53. Still, as Daugherty points out, his ability to leave the facility to make such appointments was within the exclusive control of the prison.[4]

On August 2, 2017, Daugherty was transferred to Sheridan Correctional Center. He then saw a UIC physician on September 19, 2017. *Id.* ¶¶ 4, 54. After being seen by UIC on September 19, 2017, Daugherty then filed a grievance on October 7, 2017, for Dr. Ludford's alleged failure to "obtain the necessary appointments with UIC." *Id.* ¶ 58. That grievance was denied because Daugherty did not reference the dates of the appointments. *Id.* About two months later, he filed another grievance requesting his medical records, which was denied until the month before his release. *Id.* ¶ 59. Daugherty now alleges that he is blind in the right eye and has pain in that eye and his head. He believes that prompt treatment could have prevented the pain and blindness. *Id.* ¶ 60.

On March 12, 2018, Daugherty instituted this action. Dkt. 1. After the Court granted Daugherty leave to proceed *in forma pauperis*, the Court also granted his request for recruited counsel. Dkt. 9. Following a complaint amendment and several motions to dismiss that amended complaint, Daugherty filed a second-amended complaint. Dkt. 100. Again, the Defendants filed a slew of motions to dismiss, which the Court granted without prejudice on February 21, 2020. Dkt. 186. Finally, the

---

[4] Daugherty alleges that his ability to leave the prison to make such appointments was in the exclusive control of "the Defendants." Dkt 198, ¶ 53. But the Defendants have a wide variety of roles at two different prisons. He sues the wardens, the doctors, the nurses, and a non-medical employee, as well as a private corporation. His allegations fail to describe who prevented him from making this appointment or under what circumstances.

Defendants then fired the present volley of motions to dismiss, which the Court now considers. But even if the Defendants had not filed their motions to dismiss, the Court would have had an independent and ongoing duty to monitor this action under 28 U.S.C. § 1915(e)(2) because Daugherty is proceeding *in forma pauperis*. Under that duty, the Court must dismiss if the claim is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(i)–(iii).

## II. Analysis

To defeat a motion to dismiss, the plaintiff must have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that a plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 622, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). The burden of persuasion on a motion to dismiss rests with the defendant. *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008) ("On a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint – not the plaintiffs or the court."). Furthermore, the Court considers any "documents attached to the complaint as part of the complaint itself." *Arnett v. Webster*, 658 F.3d 742, 746 (7th

Cir. 2011) (quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)).

### A. Injunctive Relief

Article III of the U.S. Constitution limits federal court's jurisdiction to live cases and controversies. U.S. Const. art. III. Injunctive relief asks the Court to proscribe a defendant's future conduct. But plaintiffs do not have a legally cognizable interest in the future conduct of prison defendants when that plaintiff no longer resides at the prison. *Bernard v. Scott*, No. 3:15-cv-50277, 2020 U.S. Dist. LEXIS 217829, at \*39–40 (N.D. Ill. Nov. 20, 2020). Thus, when an inmate leaves the jail, his or her claim for injunctive relief can no longer be considered live for the purpose of Article III of the U.S. Constitution. *Willis v. Taylor*, No. 14-cv-9150, 2016 U.S. Dist. LEXIS 7364, at \*17–18 (N.D. Ill. Jan. 22, 2016).

The only exception is where the plaintiff's return to a defendant's jail is "virtually certain." *Pennie v. County of Winnebago*, No. 96 C 50389, 1997 U.S. Dist. LEXIS 18084, at \*9 (N.D. Ill. Nov. 10, 1997). Because Daugherty is no longer an inmate at either prison, any injunctive relief would have no effect on him and is not justiciable.[5] Furthermore, he does not allege that his return to prison is virtually certain. Based on the alleged facts, Daugherty is a free man, and any argument that injunctive relief could affect him in the future would be purely speculative. Thus, his prayer for such relief cannot be heard by this Court and must be dismissed.

---

[5] This argument was raised by some of the Defendants—though in a one-sentence argument. Dkt. 219-1, at 4 ("Additionally, Defendants are not proper parties for an official capacity claim for injunctive relief because Plaintiff is no longer incarcerated."). Still, Daugherty did not respond to the argument at all.

### B. Official Capacity Claims

Even if any claim against the defendant state officials in their official capacity were to survive the Court's dismissal of Daugherty's prayer for injunctive relief, those claims would still be dismissed. In his responsive brief, Daugherty stipulated to this. Dkt. 222, at 3. But his stipulation to dismissal of the official capacity claims is without prejudice. Instead, the Court dismisses Daugherty's official capacity claims with prejudice. As further explained below, claims for monetary relief against state officials in their official capacities are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). But as explained above, the only prayer for relief that Daugherty can bring, now that he is no longer an inmate, is for monetary relief. *See supra* Section II.A. Thus, granting Daugherty leave to amend would be futile.[6]

### C. Wardens

Daugherty sues the wardens of both Dixon and Sheridan Correctional Centers. Dkt. 198 ¶¶ 19–20. Before analyzing the claims against these state officials, the Court must determine whether Daugherty sues them in their official or personal capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985) (explaining

---

[6] Furthermore, this Court has already informed Plaintiff that these official capacity claims cannot proceed. "To the extent Plaintiff seeks to recover damages from any individual Defendant in his or her official capacity, *see* Pl.'s Compl. at pg. 17, he may not do so. Although the employment status of each Defendant is unclear, official capacity claims are not properly asserted regardless of whether Defendants work for the Illinois Department of Corrections or Wexford." Order, Dkt. 9, at 5. The Court further noted that "[a]s to any Defendants who are employed by Wexford, any official capacity claim against these Defendants would be entirely duplicative of the official capacity claim against Wexford itself, and is therefore dismissed." *Id.*

the importance of the distinction in capacity and its effect on the analysis). Here, Daugherty's complaint expressly states that he brings this action against the wardens in their official capacities. Dkt 198 ¶¶ 19–20 (noting for both that "[h]e is named in his official capacity").

But the fact that the wardens are sued in their official capacity requires the Court to dismiss the claims against them. The Eleventh Amendment forecloses any claim against a state official in their official capacity for money damages. *Graham*, 473 U.S. at 169. Furthermore, state officials being sued in their official capacity for money damages are not considered persons under § 1983. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997). Instead, those claims must seek injunctive relief. Here, Daugherty seeks both injunctive and monetary relief.[7] Ordinarily, that would mean Daugherty's prayer for injunctive relief would remain and any prayer for monetary damages against the wardens would be dismissed. Daugherty, however, was released from those wardens' custody on June 22, 2018. Dkt. 198 ¶ 4. That moots all injunctive relief against them—as discussed above. This means that the wardens cannot be sued for either monetary or injunctive relief in their official capacities.

Thus, the only possible claim that could continue against the wardens would have to be in their personal capacities. But Daugherty has expressly sued the wardens only in their official capacities. Dkt. 198 ¶¶ 19–20. Furthermore,

---

[7] He includes Varga as a defendant in Count I and all defendants in Count IV. Dkt. 198, at 14, 18. However, he only mentions Warden Varga in his prayer for monetary relief. *Id.* at 20.

10

Daugherty has already had three chances to amend the complaint. Having been given ample opportunity to plead a case against the wardens, Daugherty has failed to do so. Thus, his claims against John Varga and David Gomez—as Acting Wardens of the Dixon and Sheridan Correctional Centers—are dismissed with prejudice.

### D. Count III – Respondeat Superior

Daugherty brings a claim in Count III against Wexford Health Sources on a theory of respondeat superior for the allegedly Eighth Amendment injuries caused by its employees. Wexford is a private corporation that contractual provides inmates with medical care. Dkt. 198 ¶ 78. Daugherty contends that the Seventh Circuit has opened the door to overturn the current binding precedent that prevents these claims. *Id.* ¶ 82. But the Court's binding precedent is clear. In a case against the same defendant the court explained that respondeat superior is still unavailable in these circumstances:

> We consider first the claim against the Wexford corporation itself. The question posed here is how § 1983 should be applied to a private corporation that has contracted to provide essential government services—in this case, health care for prisoners. The answer under controlling precedents of this court is clear. Such a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior liability does not apply to private corporations under § 1983.*

*Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (emphasis added).

If Daugherty is correct and this precedent is ripe for change, he will have to take that up with the Seventh Circuit on appeal. A claim involving an inmate becoming

11

blind because his treatment was delayed for months seems like a good candidate to revisit the authority. This Court is bound by *Shields*. Thus, Count III is dismissed with prejudice.

### E. Count I – Eighth Amendment

In Count I, Daugherty alleges that the individual defendants violated his Eighth Amendment right to adequate medical care.[8] Dkt. 198, ¶¶ 64–69. This requires that the Court determine whether the defendant acted with deliberate indifference to a serious medical condition. *Perry v. Sims*, No. 19-1497, 2021 U.S. App. LEXIS 6165, at *8–9 (7th Cir. Mar. 3, 2021). "Liability arises only where an official has knowledge of a substantial risk of harm stemming from a serious medical condition and fails to take reasonable measures to mitigate the risk." *Id.* Still, deliberate indifference requires that plaintiffs allege conduct that amounts to more than mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Instead, "deliberate indifference [lies] somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836.

As the Seventh Circuit has explained, deliberate indifference is a subjective standard. "To demonstrate deliberate indifference, a plaintiff must show that the defendant 'acted with a sufficiently culpable state of mind,' something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)).

---

[8] Though he includes Acting Warden's Varga and Gomez in Count I, they have already been dismissed from this case. *See supra* Section II.C.

The serious medical condition at issue here is Daugherty's allege sudden loss of vision that progressively worsened. Defendants, in ten separate motions to dismiss, challenge the sufficiency of Daugherty's allegations regarding whether they acted with deliberate indifference toward that serious medical condition. Because the various Defendants acted in different capacities, and at different facilities, the Court will address each category of defendant in turn.

### 1. Sheridan Nurses

Daugherty sues several nurses that worked at Sheridan Correctional Center: Sue Calhoun (clinical nurse), Mickey Abens, Krista Torres, and Damilola Oremakinde. Dkt. 198, ¶¶ 8–9, 11–18. Daugherty alleges that he was transferred to Sheridan on August 2, 2017, and then released on June 22, 2018. *Id.* ¶ 4. Daugherty alleges that these nurses knew about his condition starting on May 8, 2017. *Id.* ¶ 55. But that allegation is inconsistent with the allegations that they worked at Sheridan and that he did not arrive there until August. As has been explained by many courts, a plaintiff "pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits." *E.g.*, *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016) (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009)). Thus, the Court cannot accept contradictory allegations.

Because Daugherty alleges that he arrived at Sheridan on August 2, 2017, that is the first point at which the nursing staff at Sheridan would have been responsible for his care. Although the complaint does not specifically allege that, it is an entirely reasonable inference. Before arriving at Sheridan, Daugherty alleges

that he had been seen by an optometrist, Dr. Ludford, and an ophthalmologist,[9] Dr. Hanlon. Dkt. 198, ¶¶ 48, 52. Dr. Hanlon allegedly recommended an immediate referral to a specialist at the University of Illinois at Chicago. *Id.* ¶ 52. That referral examination was supposed to take place on May 24, 2017, sixteen days after his appointment with Dr. Hanlon. *Id.* ¶¶ 52–53. That appointment, however, did not happen, which Daugherty alleges was due to the indifference of the Defendants— presumably the Dixon Defendants. *Id.* ¶ 53. Daugherty was then seen by a UIC physician on September 19, 2017. *Id.* ¶ 54.

So, he arrived at Sheridan on August 2, 2017. He was seen by the UIC physician on September 19, 2017. That is roughly a month and a half. Even if the nurses at Sheridan negligently caused this wait, that would not be enough to state a claim for deliberate indifference. Daugherty alleges that these nurses knew about his condition, but he alleges no other facts specific to them. Unlike his allegations against other nurses, he does not allege that he was ever examined by the Sheridan Nurses or even spoke to them. After multiple amendments, the operative complaint remains silent as to how these particular defendants allegedly knew about his condition. Based on these allegations the Court cannot say that these nurses' behavior rose above mere negligence to reach deliberate indifference.

As these Defendants correctly reiterate in reply, Daugherty employs "broad allegations in his complaint, which cover a multi-year time span against groups of

---

[9] Ophthalmology is "a branch of medical science dealing with the structure, functions, and diseases of the eye." *Ophthalmology*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ophthalmology.

individuals that hold various positions, have different employers, and worked at two different IDOC facilities." Dkt. 223, at 2. That failure to allege personal involvement by each defendant, especially when Daugherty fails to even allege that these Sheridan Nurses examined him, is fatal to his claims.

Therefore, Daugherty's Eighth Amendment claims against the Sheridan Nurses— Sue Calhoun, Mickey Abens, Krista Torres, and Damilola Oremakinde— are dismissed.

### 2. Drs. Ludford, Funk, and Obaisi

Daugherty also brings suit against three doctors, David Ludford, Saleh Obaisi, and Arthur Funk.

Daugherty reported his blurry vision on July 20, 2016, but Dr. Ludford did not examine Daugherty until April 6, 2017. Dkt. 198, ¶¶ 23, 48. Why? Because Dr. Ludford was not hired until February of 2017. *Id.* ¶ 27. At best, Dr. Ludford could have seen Daugherty in February of 2017 instead of waiting until April 6. The complaint does not allege why Daugherty did not see Ludford until April 6, except that Daugherty alleges that he was on the list to see Dr. Ludford and that being on that list was the reason his March 2017 grievance was deemed moot.

These allegations are not enough to raise the plausible inference that Dr. Ludford was deliberately indifferent to Daugherty's condition. At most, Dr. Ludford delayed examining Daugherty by two months, and that would assume he knew immediately upon his hiring that Daugherty needed urgent care which is not

alleged.[10] Still, any such delay would only rise to the level of negligence at best. Nothing in the complaint, taken as true, places Dr. Ludford within the two poles of negligence on one end and purpose or intent on the other such that he would have had a sufficiently culpable state of mind. *See Farmer*, 511 U.S. at 836. Thus, the Court dismisses Daugherty's Eighth Amendment claims against Dr. Ludford.

As to Dr. Funk, Daugherty's alleges that Dr. Funk was the Regional Medical Director of Wexford Health Sources. Dkt. 198, ¶ 6. The other allegations against Dr. Funk are generalized and appear to further allege that Dr. Funk had supervisory duties. Still, Daugherty only sues him in his official capacity. *Id.* But for the reasons stated in section II.B above, Daugherty's official capacity claims must be dismissed. Thus, his claims against Dr. Funk are dismissed with prejudice.[11]

Daugherty alleges that Dr. Obaisi—now deceased—was at all relevant times, a physician at Sheridan Correctional Center. *Id.* ¶ 7. That is the extent of the allegations specific to Dr. Obaisi. He is, however, included in the generalized allegation, along with the Sheridan Nurses, that he knew of the risk to Daugherty if his condition went untreated. *Id.* 55. The complaint does not allege that Daugherty

---

[10] Given that Dr. Ludford had just started working at Dixon in February, a common sense and reasonable inference arises that he would have needed time to in-process and begin seeing patients, as well as time to evaluate which patients should be seen in which order. A two-month delay under these circumstances is less problematic than a two-month delay in treatment with an already up-to-speed prison physician. But regardless, Daugherty does not allege any wrongdoing specific to Dr. Ludford that would convert this delay from mere negligence into deliberate indifference.

[11] Even if Daugherty's complaint could be construed as suing Dr. Funk in his individual capacity, Daugherty does not allege wrongdoing specific to Dr. Funk. The Court already noted as much in its previous dismissal of Daugherty's action against Dr. Funk. Dkt. 186, at 10–11. On amendment, Daugherty failed to cure.

ever asked to be examined by Dr. Obaisi, or that he ever was. That is fatal to his claim. *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010) ("This lack of personal involvement makes Minix's individual-capacity claim against David more difficult, since individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation." (internal quotation marks omitted)).

Furthermore, Daugherty was seen by the UIC physician for his condition about a month and a half after arriving at Sheridan. Even accepting all possible inferences in Daugherty's favor, the Court finds no basis for a deliberate indifference claim against Dr. Obaisi. Thus, Daugherty's Eight Amendment claim against him is dismissed.

### 3. Remaining Nurses (Aguayo, King, Lance, Wagner, Whitmer, Wohlford)

Daugherty also sues several other nurses for their purported deliberate indifference to his medical condition. Some of these nurses clearly worked at the Dixon Correctional Center. Daugherty alleges that Cynthia Whitmer, Heather Lance, and Christine Aguayo were employees of Wexford Health and on the nursing staff at Dixon. Dkt. 198, ¶¶ 8–9, 13, 79, 96. Nurses King and Wohlford presumably also worked at the Dixon Correctional Center because Daugherty alleges that he visited them on March 9, 2017, while he was still housed at Dixon, and that he told them that his eye condition was worsening. *Id.* ¶ 43.

As to Nurse Wagner, however, the complaint is not clear. On the one hand, Daugherty does not say that Wagner worked at Sheridan like he expressly alleged

of Calhoun, Abens, Torres, and Oremakinde. *Compare id.* ¶ 14, *with id.* ¶¶ 15–18. On the other hand, Daugherty includes Nurse Wagner in the list of Sheridan Defendants that allegedly knew of his condition. *Id.* ¶ 55. No other allegations specific to Nurse Wagner exist in the third-amended complaint. Thus, the details pertinent to him are unclear. Regardless, Daugherty's deliberate indifference arguments against all of these remaining nurses fail.

In the third-amended complaint, Daugherty adds several new allegations. One of those is paragraph 44:

> The visits to the nurse to inquire as to the status of his waitlist request to see the eye doctor, did not treat or address his vision condition. The nursing staff did not provide any further "assessment" and had none to offer that would actually treat his vision condition. The nursing staff are not trained eye doctors, nor could they prescribe medication *or even order a referral to an outside facility*.

Dkt. 198, ¶ 44 (emphasis added). This allegation is fatal to Daugherty's claim against the nurses.

To defeat a motion to dismiss a deliberate indifference claim under the Eighth Amendment, a plaintiff must allege "a causal connection or affirmative link between the action complained about and the official sued." *See Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011). A plaintiff must also allege personal involvement on the part of the defendant in the alleged constitutional violation. *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010). Furthermore, a plaintiff pleads himself out of federal court if he includes allegations that defeat his own claims. *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016) (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009)).

18

Here, Daugherty's deliberate indifference claim centers around the allegation that the medical staff placed him on a waitlist to see an optometrist that was not currently on staff. Essentially, Daugherty contends that placing him on a waitlist to see a non-existent physician amounts to deliberate indifference. Given that an optometrist was allegedly not on staff, Daugherty believes he should have been seen by an outside provider instead of waiting for Dr. Ludford to be hired. But he also alleges that the nurses had no authority to refer him to such an outside provider. At bottom, Daugherty sues the nurses for failing to do something that he alleges they had no authority to do. Thus, their purported failure could not have caused the alleged harm because they had no authority to act.

Taking his allegations as true, they cannot form the causal connection or affirmative link that *Arnett* requires. Any personal involvement that Daugherty has alleged cannot be the cause of his injury if they had no power to remedy or prevent his injury. Therefore, his allegation that the nurses had no authority to refer him to an outside eye doctor provides an independent reason that the Court must dismiss his Eighth Amendment claim against the nurses.

As to Nurse Wagner, multiple reasons exist to dismiss the Eighth Amendment claims against him. First, he is a nurse, and presumably the above-mentioned lack of authority also applies to him. Second, if he was a nurse at Sheridan Correctional Center, as the complaint could reasonably be read to imply, then the deliberate indifference claims against him would be dismissed for the same reason as the other Sheridan Nurses, which is articulated above. Lastly, this

19

confusion surrounding Nurse Wagner is also evidence of one inescapable fact. Daugherty has not sufficiently pleaded facts specific to Nurse Wagner that could establish his role, let alone that he was deliberately indifferent. Thus, *Minix* requires the Court dismiss the Eighth Amendment claim against him. *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010) (explaining that plaintiffs claim § 1983 violations must allege personal involvement on the part of a defendant).

### 4. Nicole Bonnell

Nicole Bonnell, previously known as Nicole McCluskey, was an employee[12] at Dixon Correctional. Dkt. 198, ¶ 10. Daugherty does not allege what her role was. But he alleges that on August 8, 2016, she placed him on the waitlist to see an eye doctor, even though he seemed to allege that he had already been placed on that waitlist after his visit with the nursing staff on July 20, 2016. *Id.* ¶¶ 28–29. The allegations are a little unclear because he then refers to being placed on the waitlist on August 8, 2016, by a nurse, even though he did not allege that Bonnell was a nurse. *Id.* ¶¶ 29–30. Daugherty further alleges the Bonnell wrote the memoranda informing him that he had was on the waitlist to see an eye doctor. *Id.* ¶¶ 37, 47. He also alleges that Bonnell (1) failed to provide him with additional options regarding

---

[12] The third-amended complaint never identifies Bonnell as a medical professional. Daugherty does not refer to her as a nurse or a doctor, as he does other Defendants. And the motion to dismiss explains that Bonnell is not a member of the medical staff. Dkt. 203, at 5. Of course, the Court accepts as true the allegations in the complaint and will not consider additional facts in a defendant's motion, but the complaint does not allege Bonnell's role. For example, Daugherty alleges that she, along with the expressly alleged medical defendants, were responsible for inmate medical care. Dkt. 198, ¶ 96. But he never alleges that she is a nurse, even though he expressly does allege that of other Defendants. A thorough review of the exhibits attached to the third-amended complaint reveal no other clues as to her role.

his optometry needs, *id.* ¶ 34, and—along with Nurse Aguayo—(2) threatened that if he returned again that they would write him a ticket, which is a disciplinary action. *Id.* ¶ 35.

These allegations are not enough to maintain an Eighth Amendment claim against Bonnell. First, Daugherty fails to allege Bonnell's role or what authority she had, so the Court cannot conclude that her alleged actions have any causal connection to the harm complained of. Without more, the Court cannot determine if Bonnell could have done anything different. Second, if Bonnell is not a medical professional (given that Daugherty did not allege that she is), she would be entitled to rely on the professional judgment of her medical colleagues. *Leiser v. Kloth*, 933 F.3d 696, 705 (7th Cir. 2019) (explaining that the law encourages nonmedical staff to rely on the professional judgment of their professionally trained colleagues).

The most alarming allegation against Bonnell is that she threatened him with disciplinary action if he returned. Bonnell argues that this is not enough because it clearly did not deter Daugherty from returning to see the nursing staff. Dkt. 203, at 5. This argument is not persuasive. Deliberate indifference asks whether the defendant was subjectively indifferent such that they possessed a sufficiently culpable state of mind. It does not ask whether the plaintiff persevered over that defendant's indifference and continued asking for help.

Still, this threat of disciplinary action could provide the inference that Bonnell acted with deliberate indifference, assuming the allegations were sufficient to allege that she knew of the seriousness of condition and established the requisite

causal link. In *Arnett v. Webster*, the Seventh Circuit explained that "nonmedical officials can be chargeable with . . . deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008)). "Once an official is alerted of such of risk, the 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Id.* at 756 (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)). Of course, that assumes his or her office has such authority.

But if no causal link exists between a defendant's action and her indifference, the Eighth Amendment claim cannot be successful in a § 1983 action. In *Arnett*, the Seventh Circuit further noted that "[t]he test for establishing personal responsibility was set forth in *Genrty v. Duckworth*," in which the court explained the personal responsibility requirement:

> Of course, [the defendant prison official] cannot be personally liable under a theory of respondeat superior. However, an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Id.* at 757. Thus, a defendant must know about the conduct causing the harm, facilitate it, approve it, turn a blind eye, or otherwise fail to use his or her office to prevent the harm.

To be sure, merely placing an inmate on a waitlist to see a non-existent doctor and then threatening disciplinary action seems to manifest deliberate

22

indifference. But that indifference must have a causal connection to the harm. An administrative clerk could have known about his condition and written the memoranda informing him of his waitlist status, but that clerk would have no power to treat Daugherty or refer him to an outside provider. In short, that clerk would have no authority of office to remedy or prevent the harm. Deliberate indifference to the inmate's condition would then not be actionable against that clerk for lack of a causal connection. And apparently even nurses have the authority to threaten disciplinary action even though they have no authority to remedy Daugherty's concern. Dkt. 198, ¶¶ 35, 44 (Nurse Aguayo allegedly threatened a ticket but had no authority to refer him to an outside provider).

At bottom, a prison official cannot be held liable for a constitutional violation if that prison official had no control and no ability to prevent the constitutional harm. And Daugherty's allegations against Bonnell are too conclusory, insufficient, and otherwise incomplete to effectively allege any authority on her part. Because Daugherty has failed to allege that Bonnell had any authority to prevent his injury, his claim against her cannot continue. The allegations are simply insufficient to raise a plausible inference that she is liable. Because he has had ample opportunity to amend, his Eighth Amendment claim against Bonnell is dismissed.

### F. Count II - *Monell* claim against Wexford Health Sources

Daugherty sues Wexford Health Sources on a *Monell* theory. Liability under *Monell* exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to

23

represent official policy, inflicts the injury." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1987)).

Under *Monell*, liability may lie in three circumstances: (1) the defendant employs an express policy that causes the constitutional injury, (2) the defendant has established a widespread practice that is so well settled that it constitutes a custom or usage, or (3) the defendant has final policymaking authority and has caused the constitutional injury. *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). Furthermore, the allege policy or practice must be the "direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004). Although plaintiffs must plead enough facts to make their claim plausible, such that it raises the inference of liability, the Supreme Court has clearly held "that federal courts must not apply a heightened pleading standard" to *Monell* claims. *McCormick*, 230 F.3d at 323.

Wexford describes the alleged policy as one of "cost-cutting." Dkt. 214, at 4. But that framing of the alleged policy misses the mark. To be sure, Daugherty alleges that his situation is an example of "Wexford's practice of prioritizing cost over prisoners' medical needs." Dkt. 198, ¶ 60. But at bottom, his third-amended complaint paints a picture of a policy to place inmates on a waiting list for medical care while knowing that such medical care is not currently available, instead of referring those patients to outside providers. The reason for the practice does not change what the practice is.

In his third-amended complaint, Daugherty alleges that "Wexford supports a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of prisoners." Dkt. 198, ¶ 72. He continues that "[t]his policy includes intentionally not providing prompt treatment even though Mr. Daugherty had already been approved for the procedure" and they "placed him on a waitlist to see an in-house eye doctor when they knew no such eye doctor was employed." *Id.* ¶ 74. Furthermore, while leaving him on the waitlist to see someone that was not currently employed, they failed to refer him to an outside provider. *Id.* He further alleges that "Wexford's unconstitutional policies and customs foster an environment of deliberate indifference." *Id.* ¶ 76.

To be sure, these allegations are vague in parts. They essentially allege a culture of wrongdoing and indifference. But Daugherty does allege that the practice includes intentionally delaying medical care by placing inmates on waitlists to see doctors that are not on staff. Daugherty also incorporated the first sixty-three paragraphs of the complaint. *Id.* ¶ 70. These facts, along with the exhibits attached to his complaint, provide enough support for a reasonable inference that the policy or practice he alleges did exist.

Daugherty alleges that he was placed on a waitlist to see an eye doctor, that was not currently on staff. He alleges that multiple nurses informed him he was either on the waitlist, or that they added him back to the waitlist. Furthermore, he alleges that Nicole Bonnell sent him memoranda explaining that he was on the waitlist. Those memoranda, which were attached to his complaint, appear to be

basic forms, and not letters written specifically to Daugherty. *See, e.g.*, dkt. 198-1, at 6, Ex. D. The form memoranda have options that can be simply checked, including the option to inform an inmate that he or she was on a waitlist. The existence and use of these form memoranda creates the reasonable inference that a policy of placing inmates on waitlists existed.

Furthermore, the allegation that multiple nurses and Defendant Nicole Bonnell knew that Daugherty was on the waitlist for a doctor that was not employed—and left him there for more than eight months until an eye doctor was hired—implies that Wexford's policy was to do exactly that. Although Daugherty has not included any allegations showing other inmates experiencing the same fate, he allegations paint a picture of a practice of placing inmates on a waitlist to see a non-existent doctor. If such a practice did not exist, such a wide group of employees would likely not have informed Daugherty of the same thing—that he was on the waitlist to see an eye doctor that was not on staff. Furthermore, the allegation of a *list* of inmates that were waiting to see an eye doctor that was not currently employed provides a reasonable inference that Daugherty was not the only inmate waiting. It implies that this alleged practice affected a larger swath of persons.

Wexford argues that Daugherty's third-amended complaint contradicts his assertions because it shows that "Wexford has never denied Plaintiff a referral to an outside specialist." But that argument misses the mark. Dr. Ludford did eventually refer Daugherty to an outside specialist, but that was in April 2017. Though he does complain about not being treated properly even after Dr. Ludford's hiring,

26

Daugherty's argument in large part focuses on the length of time he was forced to remain on a waitlist without care—much of it being before Dr. Ludford was hired. The argument that Dr. Ludford eventually referred Daugherty to an outside specialist does nothing to counter the complaint about being left on the waitlist for over eight months in the first place.[13] Wexford's assertion that "[t]here is no allegation that Plaintiff was ever denied access to outside care because of a Wexford policy or custom" ignores Daugherty's complaint. Daugherty does not contend that he was denied access to medical care. He contends that Wexford's policy or practice resulted in his access to necessary medical care being unconstitutionally *delayed* such that his condition irreparably worsened. The assertion that he was eventually cared for does nothing to counter his allegations of unconstitutional delay.

Wexford further points to Daugherty's refusal of medical care by the nurses. That is a red herring. As Daugherty alleges, and common sense supports, nurses are not eye doctors. They are, therefore, not trained to provide medical assessments of inmates' vision problems. The assertion that Daugherty declined further medical care by staff incapable of addressing his needs does not in any way counter his allegations of deliberate indifference.[14]

---

[13] Daugherty does at times frame his policy or practice argument in broader terms than just being left on a waitlist. In response, he asserts that Wexford's policy resulted in his being denied adequate care for fourteen months. Dkt. 222, at 9. Although his argument does not perfectly define the contours of the alleged policy or practice, the Court still holds that his complaint adequately pleads the existence of such an unconstitutional policy or practice.
[14] The complaint and its exhibits do—as some Defendants point out—show that at one visit to a nurse, Daugherty could read and identify objects. But here again, that assertion does nothing to counter his allegations. Losing vision in one eye does not mean a person cannot see, read, and identify objects. Daugherty presumably still had a functional left eye.

Because Daugherty's factual allegations raise the reasonable inference that Wexford maintains a policy or practice that unconstitutionally delays inmate medical care, and that such a practice was the moving force behind Daugherty's worsened eye injury, his allegations state a *Monell* claim against Defendant Wexford Health Sources. Therefore, their motion to dismiss Count II, is denied.

### G. Intentional Infliction of Emotional Distress

Finally, Daugherty sues all Defendants for intentional infliction of emotional distress (IIED). Dkt. 198, at 18. He alleges that the Defendants knowingly deprived him of adequate medical care, and in doing so, "demonstrated a pattern of such conduct over the course of several years." *Id.* ¶ 90. He alleges that he feared for his health, wellbeing, and life, and that the Defendants' actions caused his vision to deteriorate to complete central vision loss in the right eye. *Id.* ¶ 91. He further claims that Defendant Wexford Health is liable through "*respondeat superior* for its authorization and ratification of the tortious acts committed by its employees. *Id.* ¶ 96.

The Illinois Supreme Court set out the elements of intentional infliction of emotional distress in *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988):

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*Id.* at 809. In other words, a defendant's conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized

community." *Feltmeier v. Feltmeier*, 798 N.e.2d 75, 83 (Ill. 2003). Furthermore, under Illinois law, a plaintiff must also be able to show that the defendant's actions proximately caused the plaintiff's injury. This is true even for the intentional infliction of emotional distress. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1126 (Ill. 2015).

### 1. Dr. Funk

Daugherty only sued Dr. Funk in his official capacity. But Daugherty's official capacity claims against Dr. Funk—including his IIED claim—have already been dismissed above. No further analysis is necessary, especially given that Dr. Funk does not offer alternative arguments for dismissing the claims against him.

### 2. Defendants Aguayo, Bonnell, Lance, Ludford, Obaisi, Wagner, Whitmer, and Wexford Health Sources

Quoting *McCaskill v. Barr*, 92 Ill. App. 3d 157, 158 (1992), Defendants Aguayo, Bonnell, Funk, Lance, Ludford, Obaisi, Wagner, Whitmer, and Wexford Health Sources first assert that, under Illinois law, IIED claims "must be specific, and detailed beyond what is normally considered permissible in pleading a tort action." *E.g.*, Dkt. 201, at 8. But pleading standards are procedural, not substantive. Ever since *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts apply federal procedure and state substantive law.

These Defendants next argue that Daugherty's complaint fails to allege that he "suffered *any* emotional distress, let alone distress so severe that no reasonable man could be expected to endure it." *E.g.*, Dkt. 201, at 9. Furthermore, Defendants

29

argue that because their conduct does not rise to the level of deliberate indifference, it also cannot raise to the level of extreme and outrageous conduct—a higher bar. The Court agrees.

The extreme and outrageous conduct standard is a higher bar than the requirements for deliberate indifference under the Eighth Amendment. *Estate of Gomes v. Cnty. of Lake*, 178 F. Supp. 687, 702 (N.D. Ill. 2016). Daugherty has failed to adequately plead deliberate indifference on the part of each of these individual defendants. The same is true of his IIED claim. Even if the Court accepts inferences that Daugherty has pleaded sufficient emotional distress, he has not alleged how each defendant's action led to such distress. On the contrary, his allegations amount to the nurses doing their jobs in a ministerial fashion. For example, he has alleged that the Defendant Nurses placed him on a waitlist and left him there without referring him to an outside eye doctor. But he also pleaded that they had no discretion to do otherwise. Dkt. 198, ¶ 44.

He has alleged that Defendant Bonnell provided him with memoranda informing him of his status on that waitlist, but not how performing that job function displays any outrageous and extreme conduct. And he faults the Defendant Doctors for failing to ensure that he was immediately seen for his eye condition. But these doctors were either not on staff for many months or did examine Daugherty when in the position to do so. Any delays, under these allegations specific to the doctors, would amount to simple negligence at best—far below extreme and outrageous.

Finally, Daugherty sues Wexford Health Sources on a theory of respondeat superior. Dkt. 198, ¶ 96. But the Court dismisses Daugherty's IIED claim against all of Wexford's employees. With no employees left on the hook, no respondeat superior claim can survive.

### 3. Wardens

Like Dr. Funk, Wardens Varga and Gomez have already been dismissed from this case, as discussed above. This includes Daugherty's IIED claims against them. No further analysis is necessary.

### 4. Defendants Abens, Calhoun, King, Oremakinde, Torres, and Wohlford.

These last Defendants argue that Daugherty's IIED claims against them should be dismissed because he "does not provide any details as to the medical care each of them allegedly deprived him of, or how their specific conduct was extreme and outrageous." Dkt. 219, at 10. They also assert that Daugherty fails to explain which acts were intended to cause such emotional distress, and also that nothing in complaint points to any conduct that otherwise rises to the level of extreme and outrageous. Instead, these Defendants contend, Daugherty merely recites the elements of the tort. *Id.* at 10–11. Again, the Court agrees.

Daugherty alleges that Abens, Calhoun, Oremakinde, and Torres knew about the substantial risk to his eye, that they were nurses at Sheridan, and then he concludes that he was harmed as a result of their actions. Dkt. 198, ¶¶ 15–17, 55,

97. But that is it, and it is not close to enough to allege extreme and outrageous conduct.

Finally, as to Nurses King and Wohlford, he alleges that he presented to them at sick call on March 9, 2017, "to inquire about the status of his request to be seen by an eye doctor. *Id.* ¶ 43. He explained to Nurses King and Wohlford that he had requested the examination nine months ago, and his vision had become worse. *Id.* But that merely alleges that these two nurses knew his condition had worsened and that he needed to see an eye doctor. Given that Dr. Ludford had just been hired the month before, and then examined Daugherty the month after, this allegation does nothing to show extreme or outrageous conduct on the part on these nurses.

At bottom, Daugherty seems to argue that the Defendants collectively had control over him, attempted to exert that control by threatening disciplinary action, and did so in a way that was extreme and outrageous. But he cannot aggregate discrete allegations against sixteen individuals and assume that all allegations can be imputed to each Defendant. To be successful in suing sixteen individuals for intentional infliction of emotional distress, he must include allegations that, if true, raise the plausible inference of liability as to each Defendant. He has failed to do that, and the Court, therefore, must dismiss his claims.

## III. Conclusion

For the reasons set forth above:

(1) the motion to dismiss Nurse Aguayo [200] is granted;

(2) the motion to dismiss Nicole Bonnell [202] is granted;

(3) the motion to dismiss Dr. Funk [204] is granted;

(4) the motion to dismiss Nurse Lance [206] is granted;

(5) the motion to dismiss Dr. Ludford [207] is granted;

(6) the motion to dismiss the personal representative for the estate of Dr. Obaisi [209] is granted;

(7) the motion to dismiss Nurse Wagner [211] is granted;

(8) the motion to dismiss Wexford Health Sources [213] is denied as to Count II and granted as to Counts III and IV;

(9) the motion to dismiss Nurse Whitmer [215] is granted; and,

(10) the aggregate motion to dismiss John Varga, David Gomez, and Nurses Abens, King, Oremakinde, Calhoun, Wohlford, and Torres [219] is granted.

* * *

All official capacity claims are dismissed with prejudice. Count III, based on respondeat superior, is dismissed with prejudice. All other dismissals are without prejudice at this time. If during discovery on the Monell claim against Wexford, Daugherty discovers sufficient evidence under Federal Rule of Civil Procedure 11 to replead against these other defendants, he may file an amended complaint, provided the amended pleading is filed before the cut off contained in the case management order. Upon expiration of the amended pleading date, the dismissals will automatically become with prejudice.

Date:  March 12, 2021

Honorable Iain D. Johnston
United States District Judge